# Supreme Court of Florida

---

No. SC2024-0990

---

**DEAN K. MATT,**
Appellant,

vs.

**STATE OF FLORIDA, et al.,**
Appellees.

July 9, 2026

FRANCIS, J.

Appellant, Dean K. Matt, appeals the final judgment validating the University Park Recreation District's 2024 bond issue, which was approved via referendum by a majority of Matt's fellow residents to improve the neighborhood's recreational services. We have jurisdiction[1] and affirm the bond validation final judgment.

---

1. Art. V, § 3(b)(2), Fla. Const.

## I. BACKGROUND

## The University Park Recreation District

Appellee, the University Park Recreation District ("UPRD"), is a special, independent recreation district that was established in 2018 under chapters 189 and 418, Florida Statutes,[2] and by Manatee County Ordinance Number 18-29 (effective August 2, 2018). The purpose of creating the UPRD as an independent recreation district was to purchase, maintain, and improve the University Park Country Club, including its clubhouse, twenty-seven-hole golf course, and other recreational facilities. *See* Manatee County, Fla., Ordinance No. 18-29 (Aug. 2, 2018); *see also*

---

2. *See* § 189.011(1)-(2), Fla. Stat. (2018) (noting the Legislature's specific intent that "independent special districts shall only be created by legislative authorization" and its findings that "special districts serve a necessary and useful function by providing services to residents and property in the state" and that "special districts operate to serve a public purpose and that this is best secured by certain minimum standards of accountability"); § 189.03(2)(a), Fla. Stat. (2018) (noting the State's policy that "independent special districts may be used by the private and public sectors, as authorized by state law, to manage, own, operate, construct, and finance basic capital infrastructure, facilities, and services"); §§ 418.20, .24, Fla. Stat. (2018) (authorizing each municipality and county to create recreation districts; providing that a recreation district's charter may be created or amended by filing an ordinance).

§ 418.22(3), Fla. Stat. (2018) (listing powers a charter may grant a recreation district, including the power to "acquire, purchase, construct, improve, and equip recreational facilities of all types").

Ordinance 18-29 contains specific legislative findings establishing that the UPRD "serves a public purpose." Ordinance 18-29 at 2. Among those findings, Ordinance 18-29 provides that "[t]he creation of the UPRD is the best available alternative for delivering . . . recreational services and facilities because it provides flexible funding mechanisms to assure the long-term availability of recreational facilities and services for the residents of the UPRD." *Id.* The legislative findings also establish that "[t]he UPRD is amenable to separate special district government" based on a vote by the majority of the "electors" (one vote per either owner or resident); that "[a]ll of the territory within the UPRD will be benefitted by the long-term operation and maintenance of the recreational facilities by the UPRD"; and that "[t]he health and well-being of the public within the UPRD will be benefitted by the establishment of the UPRD." *Id.*

**2019 Bond Issue**

To carry out the primary purpose of the UPRD—to purchase

- 3 -

the University Park Country Club and finance its maintenance and improvements—the UPRD, through its duly elected Board of Supervisors ("Board"),[3] was authorized to issue bonds following a referendum.[4] And in November 2019, the UPRD was authorized by referendum to do a bond issue and entered a Master Trust Indenture with Trustee, U.S. Bank Trust Company, National Association (successor trustee to U.S. Bank, National Association). Though the Master Indenture is not included in the limited record in this appeal, UPRD Resolution 2024-08 explains (and there is no dispute) that "the provisions of the Master Indenture contemplate that Bonds can be issued in one or more Series or sub-Series

---

3. The electors within the UPRD voted to establish the "Board of Supervisors," a five-person board authorized to govern the UPRD and carry out the powers given to it under section 418.22 and Ordinance 18-29.

4. *See* § 418.22(4), (7), Fla. Stat. (listing powers a charter may grant a recreation district, including the power to issue bonds secured by ad valorem taxes as well as revenue bonds "and other revenues" after a referendum, and "all further or additional powers as the governing body of the municipality or county establishing the district may deem necessary or useful in order to exercise the powers"); Ordinance 18-29 at 7, 9 (authorizing UPRD to additionally issue bonds secured by non-ad valorem assessments after a referendum).

pursuant to one or more Supplemental Indentures, with the consent of qualified voters." UPRD Resol. 2024-08 at 2 (Jan. 12, 2024). This includes but is "not limited to, the Series 2019 Project, and that such Series or sub-Series of Bonds, whether issued at the same time or not, can be separately secured by Non-ad Valorem Assessments imposed by separate assessment proceedings." *Id.*

Thus, for the 2019 bond issue, a first supplemental indenture was executed. As relevant to this case, section 5.04, entitled "Additional Bonds," contained bracketed language indicating there would be no further bond issues after the 2019 bond issue. That section states:

> The Issuer covenants not to issue any other Bonds or other debt obligations secured by the Series 2019 Non-Ad Valorem Assessments. [In addition, the Issuer covenants not to issue any other Bonds or debt obligations for capital projects, secured by Non-Ad Valorem Assessments on the assessable lands within the District that are subject to the Series 2019 Non-Ad Valorem Assessments. Such covenant shall not prohibit the Issuer from issuing refunding Bonds, or to finance any other capital project that is necessary to remediate any natural disaster, catastrophic damage or failure with respect to the Series 2019 Project.] **[To be Discussed].**

(Brackets and emphasis in original.)[5]

---

5. To be clear, section 5.04's "**[To be Discussed]**" language was included in the original 2019 supplemental indenture.

The aggregate principal amount issued in the Series 2019 bonds was $24,000,000. The 2019 bond issue was validated on September 16, 2019, in the Twelfth Judicial Circuit Court in case number 2019-CA-000845, and no appeal was taken.

## This Case: The 2024 Bond Issue

Matt purchased a home within the UPRD in May 2021 and reviewed section 5.04 of the first supplemental indenture before making his purchase. As he made clear throughout this litigation, his expectation was that there would be no further bond issues. But the Board proposed a 2024 bond issue. Matt objected, raising the bracketed language in section 5.04.

Specifically, in November 2023, the Board passed Resolution 2024-01 expressing its interest in another bond issue in the amount of $21,000,000 upon approval of the electors by referendum. The bonds would fund a capital improvement project to "build and expand certain facilities and fix certain infrastructure needs." UPRD Resol. 2024-01, Ex. A (Nov. 3, 2023). The Board specifically listed the items to be added, fixed, or improved, along with the estimated costs, in the project description attached to the

resolution:

- Golf Course Irrigation and Infrastructure     $ 6,000,000
- Kitchen Expansion and Modernization     $ 3,000,000
- Fitness Centre Expansion and Renovation     $ 3,500,000
- Activity and Administration Centre     $ 5,500,000
- Additional Parking     $    500,000
  - Total:     $18,500,000

*Id.*

Another resolution was passed in December 2023, in which the Board adopted an updated Master Assessment Methodology report ("Methodology report"). UPRD Resol. 2024-07, Ex. B (Dec. 8, 2023). In the Methodology report, the special benefits to be conferred by the proposed 2024 bond issue on the UPRD property owners were analyzed in section 1.6. *Id.* And section 1.6 described those benefits—the improvement of recreational facilities—generally in terms of increasing and preserving property values associated with a golf course community. *Id.*

The referendum vote on the proposed 2024 bond issue was set for January 16, 2024. In the meantime, the Board conducted meetings and town halls with the residents, at which Matt seems to have led the charge in opposition, arguing that the section 5.04 bracketed language barred further bond issues. He also challenged

the Methodology report, arguing that the "special benefits" finding must be supported by a monetary value under this Court's decision in *City of Boca Raton v. State*, 595 So. 2d 25 (Fla. 1992). And finally, he challenged the Methodology report on the basis that it did not reflect the overall cost and how the special benefits would outweigh them.

Ultimately, the Board heard Matt's concerns and took steps to correct and clarify the section 5.04 bracketed language in the 2019 supplement. On January 12, 2024, four days before the scheduled referendum vote, the Board passed Resolution 2024-08 to correct the first supplemental indenture and authorize a second supplement to the Master Indenture. The Board cited its authority in section 13.01 of the Master Indenture to amend the first supplemental indenture without the consent of the bondholders because the "amendments do not adversely affect the rights and remedies of such Bondholders." Resol. 2024-08 at 3. Instead, the Board said that the amendments are meant to "cure any ambiguity or to cure, correct or supplement any defective provision (whether because of any inconsistency with any other provision in the Master Indenture or otherwise) in the First Supplemental Indenture." *Id.*

Resolution 2024-08 then clarified that the bracketed formatting of section 5.04 and the bolded "[To be Discussed]" language was inserted "during the period when two lawsuits were pending against the [UPRD], one challenging the formation of the [UPRD] and one contesting the validation of the Series 2019 Bonds . . . in case it would be useful to the [UPRD] in connection with any settlement discussions." Resol. 2024-08 at 2. The resolution also explained that the bracketed language was never "agreed upon by the [UPRD], whether before or after the resolution of the lawsuits, for inclusion in any [s]ection 5.04" nor "intended to be inserted in any final [s]ection 5.04 of the First Supplemental Indenture." *Id.* Further, the resolution explained that the bracketed language in section 5.04 conflicted with the Master Indenture: "[T]he Master Indenture and the Official Statement, dated November 13, 2019 . . . relating to the public offering of the Series 2019 Bonds contemplated that the District may issue additional Bonds in the future secured by separate assessments on the same benefitted properties . . . ." *Id.*

Ultimately, Resolution 2024-08 set out the following bolded, underlined, and struck-through amendment to section 5.04

governing "Additional Bonds":

> The Issuer covenants not to issue any other Bonds or debt obligations secured by the Series 2019 Non-Ad Valorem Assessments. [In addition, the Issuer covenants not to issue any other Bonds or debt obligations for capital projects, secured by Non-Ad Valorem Assessments on the assessable lands within the District that are subject to the Series 2019 Non-Ad Valorem Assessments.] Such covenant shall not prohibit the Issuer from issuing refunding Bonds, or to finance any other capital project that is necessary to remediate any natural disaster, catastrophic damage or failure with respect to the Series 2019 Project.] **[To be Discussed]** **Notwithstanding the foregoing covenant, the Issuer may, pursuant to authority granted by the Master Indenture, issue additional Bonds secured by Non-Ad Valorem Assessments to finance a Project specially benefitting District Lands, including District Lands that are subject to the Series 2019 Non-Ad Valorem Assessments.**

*Id.* at 3-4.

On January 16, 2024, the referendum was held and the 2024 bond issue passed by a vote of 579 (yes) to 363 (no). *See* UPRD Resol. 2024-11 (Jan. 16, 2024). The next day, the Board passed Resolution 2024-12 authorizing the 2024 bond issue and counsel to seek validation in the Twelfth Judicial Circuit Court for Manatee County. *See* UPRD Resol. 2024-12 (Jan. 17, 2024).

### Bond Validation Proceedings

On February 14, 2024, the UPRD filed its complaint for bond

- 10 -

validation. The complaint narrowly focused on the UPRD's authority to issue the 2024 bond series and did not mention the issue concerning the bracketed section 5.04 language. The circuit court issued its order to show cause on February 28, 2024.

Matt filed his answer on April 23, 2024. First, Matt asserted that the bracketed section 5.04 language acted as a bar to the 2024 bond issue. Second, Matt asserted that the UPRD did not meet its burden under this Court's decision in *City of Boca Raton* to show special benefits.

Between the complaint and Matt's answer, however, on March 8, 2024, the Board passed Resolution 2024-13, which corrected minor technical issues in Resolution 2024-08 requested by the Trustee.[6]  *See* UPRD Resol. 2024-13 (Mar. 8, 2024). In his April 23

---

6. According to the agenda from the Board's March 8 meeting, Resolution 2024-13 made the following changes:

> Page 1- lower cased "qualified voters", as it is not a defined term in the Indenture.
> Page 2- clarified which brackets were referenced, and that the reference to Section 5.04 referred to the First Supplemental Indenture.
> Page 3- removed the Trustee as the party "wishing" to reconcile the inconsistent language, as the Trustee is a neutral party.

answer—as well as in his later filed post-hearing emergency motion to stay—Matt complained about the preparation of two different versions of Resolution 2024-13, as well as the two different versions of the second supplement to the Master Indenture.  As to Resolution 2024-13 that was passed on March 8, he pointed out inconsistencies in the dates: the unexecuted version reflects it was passed on March 22, 2024; whereas the executed version contains a scrivener's error as to the date it was passed, stating: "PASSED . . . this 8th day of January, March 2024."  Similarly, he pointed out inconsistencies in the dates for the second supplement to the Master Indenture: the unexecuted version has a March 1, 2024, effective date, whereas the executed version had a January 1, 2024, effective date.  Matt expressed his view in his answer that the differing dates demonstrate sketchy backdating.  And later in his post-hearing emergency motion to stay, Matt went further, claiming

---

Page 4- clarified that the language enabling this amendment is the same in both the Master Indenture and the First Supplemental Indenture.

Signature page- updated the name change for the Trustee which had been overlooked.

This Second Supplemental Indenture shall replace the version previously approved by adoption of Resolution 2024-08.

the differing dates showed the Board engaged in fraudulent behavior.

The validation hearing was held on April 29, 2024.[7] At the hearing, the UPRD submitted the Methodology report, which was admitted into evidence, and called its author, Kevin Plenzler, to testify.[8] As to special benefits, Mr. Plenzler testified that "the continued enhancement of the recreational facilities of UPRD will create special benefits peculiar to and based on the logical relationship to the assessable properties in UPRD because those recreational facilities are an integral part of the University Park development." As to allocation methodology, he testified that "given . . . the wide range of home values within UPRD, . . . this was done on a percentage comparison basis to show that the growth in home values exceeds the cost per unit and that this is reasonable given

---

7. Because no court reporter was present at the validation hearing, the parties recreated the proceedings through a "Statement of Evidence or Proceedings" under Florida Rule of Appellate Procedure 9.200(b)(5), which was approved by Judge Edward Nicholas, the circuit judge who presided over the hearing, on August 30, 2024.

8. Mr. Plenzler is the director of PFM Financial Advisors, LLC.

that reinvestment in the broader club assets regardless of any one persons' specific use of an amenity will protect and/or cast value to all properties on a relative basis."

During Matt's cross-examination of Mr. Plenzler, Matt conceded the fair apportionment prong under the *City of Boca Raton* decision, agreeing it was fair and reasonable, but pressed Mr. Plenzler on how the special benefits increase the market values of the UPRD properties. Mr. Plenzler responded that Florida law does not require a regression analysis or mathematical precision. He also explained that the Methodology report "demonstrates that special benefits exceed total burden of debt" and referred to section 1.6, "where . . . his analysis showed that '[s]ince 2017, UPRD property values . . . have increased by 37.5% based on data via the Manatee County Property Appraiser.' " He further stated that the proposed assessments would, on average, amount to 2.73% of the 2022 market values of the homes.

Matt also testified at the hearing, primarily presenting the arguments asserted in his answer. Over a relevancy objection, the circuit court admitted all of Matt's exhibits, including a copy of section 5.04 and its bracketed language from the 2019 supplement

and video segments of his appearances at the hearings and town halls before the Board.

Though the circuit court stated that it would review Matt's exhibits before entering final judgment, it orally announced at the end of the hearing that it found the bond issue to be valid.

On May 13, 2024, Matt filed an emergency motion to stay the final judgment. In his motion to stay, as already mentioned, he took issue with the two different versions of Resolution 2024-13 and alleged that the UPRD engaged in possibly fraudulent and illegal activity.

The final judgment validating the bonds was issued the next day, on May 14. The circuit court concluded that the UPRD had the authority to issue the 2024 bonds and that the special benefits exceeded the total burden of debt based on Mr. Plenzler's testimony, which the court deemed "persuasive, compelling, factually supported and largely unrebutted." The final judgment does not address Matt's arguments concerning the bracketed section 5.04 language.

**Postjudgment Proceedings**

Matt's motion for stay was denied on May 15, one day after

entry of the final judgment validating the 2024 bond issue. Matt moved for rehearing on May 24, which was denied on June 4.

Matt also filed an unsworn motion to disqualify the circuit court judge, Judge Edward Nicholas, on May 24, more than twenty days after the April 29 bond validation hearing. As grounds, he asserted that Judge Nicholas should be disqualified because he rendered the May 14 final judgment before considering Matt's May 13 motion for an emergency stay and without considering all of Matt's exhibits from the April 29 hearing, including video recordings that were admitted into evidence. Additionally, Matt asserted that Judge Nicholas demonstrated prejudice toward him during the hearing by treating him disrespectfully, alleging that "[t]wice during the Hearing, Judge Nicholas went on five-minute soliloquies/rants and lectured Defendant in a rude, sarcastic tone saying (paraphrasing) 'No one is forcing you to stay in University Park and if you don't like it you should move to Myakka (City).'"

Judge Nicholas entered an order denying Matt's motion as legally insufficient under Florida Rule of General Practice and Judicial Administration 2.330(c) because it was unsworn and, alternatively, was not accompanied by a supporting affidavit.

**This Appeal**

Matt now raises three issues on appeal. First, he asserts the final judgment must be reversed because the UPRD lacked authority under the bracketed language in section 5.04 to impose another special assessment on the residential properties already servicing the 2019 bond issue. Second, Matt asserts that the UPRD failed to meet its burden at the hearing of proving the residential properties to be assessed would derive a special benefit outweighing the amount of the assessment pledged to repay the 2024 bond issue. Finally, Matt asserts the circuit court violated his due process right to a fair hearing by exhibiting prejudice toward him and failing to review his exhibits and emergency motion before entering final judgment. For the reasons explained below, we affirm.

## II. ANALYSIS

### Scope and Standard of Review of Bond Validation Judgments

The following rules and standard of review apply to both issues 1 (the UPRD's authority) and 2 (special benefit to assessed properties), so we discuss those issues together.

Chapter 75, Florida Statutes, governs the validation of bonds

and provides that a public body may determine its authority to incur bonded debt by filing a complaint in circuit court. § 75.02, Fla. Stat. Prior to filing this complaint, the public body must hold a referendum and show that the results are in favor of the issuance of such bonds. § 75.03, Fla. Stat. The circuit court has jurisdiction to determine the validity of the bonds and must issue an order requiring interested parties to appear at a hearing to show why the complaint should not be granted and the bonds validated. § 75.05, Fla. Stat. At the hearing, the circuit court determines all questions of law and fact and renders a final judgment regarding the validity of the bonds. § 75.07, Fla. Stat. Any party dissatisfied with the final judgment may appeal to this Court within the time and manner prescribed by the Florida Rules of Appellate Procedure. § 75.08, Fla. Stat.

On appeal, the scope of this Court's review in bond validation proceedings is generally limited to three issues: "(1) whether the public body has authority to issue the subject bonds; (2) whether the purpose of the obligation is legal; and (3) whether bond issuance complies with the requirements of law." *Fla. Bankers Ass'n v. Fla. Dev. Fin. Corp.*, 176 So. 3d 1258, 1265 (Fla. 2015).

"[T]he function of a validation proceeding is merely to settle the basic validity of the securities and the power of the issuing agency to act in the premises. Its objective is to put in repose any question of law or fact affecting the validity of the bonds." *Keys Citizens for Responsible Gov't, Inc. v. Fla. Keys Aqueduct Auth.* (*Keys Citizens*), 795 So. 2d 940, 947 (Fla. 2001) (quoting *State v. Manatee Cnty. Port Auth.*, 171 So. 2d 169, 171 (Fla. 1965)).

The circuit court's order "comes to the Court with a presumption of correctness," and "[t]he appellant has the burden of demonstrating that the record and evidence [fail] to support the [bond issuer] and the [circuit] court's conclusions." *Fla. Bankers Ass'n*, 176 So. 3d at 1265-66 (some alterations in original) (quoting *Donovan v. Okaloosa County*, 82 So. 3d 801, 805 (Fla. 2012)). This Court reviews the circuit court's factual findings for competent, substantial evidence and its legal conclusions de novo. *Id.* at 1266.

### Issue 1 – Authority to Issue the 2024 Bonds

Matt argues that the UPRD lacked authority to conduct the referendum because the bracketed section 5.04 language proposing to prohibit additional bonds was still in effect and legally binding at the time the UPRD expressed interest in holding a referendum on

- 19 -

the 2024 bond issue. He further argues that the referendum was premature because the section 5.04 language had not yet been cured when the referendum was held. Finally, he argues that the circuit court erred in failing to address the section 5.04 language.

Given the limited scope of bond validation proceedings, however, we find no error in the circuit court's order concluding that the UPRD has the authority to issue the 2024 bonds.

As a foundational point, the circuit court properly found that the UPRD, as an independent recreation district, had authority to issue bonds under chapter 418, Florida Statutes, and Manatee County Ordinance 18-29. The very purpose of such districts is to essentially be statutorily authorized "financing vehicles." *See State v. Sunrise Lakes Phase II Special Recreation Dist.*, 383 So. 2d 631, 633 (Fla. 1980) (recognizing that "recreation districts are essentially financing vehicles which allow residents of a limited geographic area to provide for improvements that substantially benefit the residents in the district" and "[t]o finance these facilities, the charter of the recreation district may grant many powers including the power to issue bonds").

And the circuit court did not err in specifically determining

that the UPRD had the authority to hold a referendum under section 75.03, Florida Statutes, to authorize the 2024 bond issue. Under section 75.03, the referendum is the first step—and in fact a condition precedent—to determining a district's authority to issue bonds through the validation process:

> As a condition precedent to filing of a complaint for the validation of bonds . . . the . . . district desiring to issue them shall cause an election to be held to authorize the issuance . . . and show prima facie that the election was in favor of the issuance . . . .

§ 75.03, Fla. Stat.

In rejecting a similar prematurity argument, this Court in *Florida Bankers Ass'n* elaborated on why determining a district's authority is the first step in a bond validation proceeding under another provision of chapter 75, section 75.02:

> Section 75.02, Florida Statutes, expressly states that the plaintiff in a bond validation proceeding "may determine its authority by law to issue bonds." This presupposes that the bonds will **not** be issued and specific payment provisions enacted until **after** the validation proceeding. [The district] has statutory authority and a properly enacted resolution to issue the bonds and to seek a determination of the validity of the bond issue **before** it does so.

176 So. 3d at 1267 (emphasis added) (citation omitted). In other words, without a majority of the UPRD owners or residents voting

for the bond issue, there would be no bond issue to validate as it would have been defeated at the referendum stage.

Here, the record reflects the UPRD complied with sections 75.02 and 75.03 and the referendum passed. Thus, Matt has not demonstrated that the circuit court erred in concluding the UPRD was authorized by referendum (as a condition precedent) and by law to issue the 2024 bonds.

Matt, however, wants to tie the hands of the UPRD with the first supplemental indenture's bracketed language proposing to prohibit further bond issues and have the referendum declared illegal. But as noted above, Matt has this backwards: under chapter 75, the issue of authority comes first and, thus, necessarily required a referendum. Otherwise, without the referendum, there would be no authorized bond issue necessitating the bond validation process.

As to whether the bracketed language in section 5.04 barred any further bond issue, we have said that "[s]ubsumed within the inquiry as to whether the public body has the authority to issue the subject bond is the legality of the financing agreement upon which the bond is secured." *Id.* at 1266 (quoting *Keys Citizens*, 795 So. 2d

at 946). But while the legality of a financial agreement itself is part of the limited scope of review on appeal, Matt does not challenge the legality of the entire financial agreement, i.e., the 2019 Master Indenture (a copy of which was not supplied by the parties), nor does he challenge the legality of the first supplemental indenture containing the bracketed section 5.04 language. As we explain, Matt's arguments about the effect of the bracketed language lack merit in any event, so we need not decide whether this aspect of his challenge falls within the scope of what our precedents have referred to as "the legality of a financial agreement."

Even if Matt's challenge only to the bracketed section 5.04 language is within the scope of this Court's review, Resolution 2024-08 makes clear that the bracketed language was never adopted, and the resolution itself authorized a second supplemental indenture to amend and cure this language. Notably, Resolution 2024-08 was adopted before the referendum was held, and the second supplemental indenture was executed before the bond validation hearing. Further, Matt does not dispute the UPRD's finding in the resolution that the Master Indenture contemplates further bond issues. And though Matt takes issue with the order in

which the Board acted in passing these resolutions, he has not demonstrated that it lacked the authority to do so.

Thus, it appears the Board had the power to correct the 2019 first supplemental indenture by issuing a second supplemental indenture to ensure there was nothing encumbering the special assessment pledged for the repayment and marketability of the 2024 bond issue. And because the UPRD cured this issue by amending the bracketed section 5.04 language through resolutions and authorizing a second supplemental indenture to the Master Indenture, we find no error in the circuit court's final judgment based on its lack of discussion about the section 5.04 issue.

Accordingly, Matt has not carried his burden of demonstrating that the circuit court erred in concluding that the UPRD has the authority to issue the 2024 bonds.[9]

**Issue 2 – Additional Special Assessment Analysis**

Next, Matt argues that in validating the 2024 bond issue, the circuit court erred in concluding that the residential properties

---

9. To the extent Matt complains that he was induced to purchase his home in the UPRD community due to the language in section 5.04, that is a collateral matter that has nothing to do with whether the UPRD has authority to issue the 2024 bonds.

burdened by the special assessment within the UPRD community would derive a special benefit that exceeds the burden of debt.

When a bond issuance is to be funded by special assessments, this Court applies an "additional two-pronged test to evaluate whether those special assessments meet the requirements of the law." *Citizens Advocating Responsible Env't Sols., Inc. v. City of Marco Island,* 959 So. 2d 203, 206 (Fla. 2007). The two-pronged test requires that: "(1) the property burdened by the assessment must derive a special benefit from the service provided by the assessment; and (2) the assessment for the services must be properly apportioned among the properties receiving the benefit." *City of Winter Springs v. State,* 776 So. 2d 255, 257 (Fla. 2001).[10]

_____

10. This review is aimed at ensuring the special assessment is just that—a special assessment and not a tax—because the hallmark of a special assessment is that it confers a special benefit to subject property owners that is fairly apportioned. *See City of Boca Raton,* 595 So. 2d at 29 ("A special assessment is like a tax in that it is an enforced contribution from the property owner, it may possess other points of similarity to a tax but it is inherently different and governed by entirely different principles. It is imposed upon the theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment." (quoting *Klemm v. Davenport,* 129 So. 904, 907 (Fla. 1930))).

"The apportionment of benefits is a legislative function, and if reasonable persons may differ as to whether the land assessed was benefitted by the local improvement, the findings of the city officials must be sustained." *City of Boca Raton*, 595 So. 2d at 30.

As this Court has stated, "[i]n evaluating whether a special benefit is conferred to property by the services for which the assessment is imposed . . . the test is whether there is a 'logical relationship' between the services provided and the benefit to real property." *Morris v. City of Cape Coral*, 163 So. 3d 1174, 1177-78 (Fla. 2015) (quoting *Lake County v. Water Oak Mgmt. Corp.*, 695 So. 2d 667, 669 (Fla. 1997)).

Matt focuses on the first prong,[11] arguing that the UPRD did not meet its burden of demonstrating empirically how the special benefit will exceed the debt burden because it failed to present the type of testimony presented in *City of Boca Raton*. In that case, the City's urban economic consultant testified that "his analysis

_____

11. Matt does not challenge the second prong, that the special assessment will be fairly apportioned, and the final judgment's conclusion that the assessment will be fairly apportioned is unrefuted.

showed that the subject properties 'would at least on a cumulative basis receive $7 of benefit for every $1 that they were paying in assessments' " and opined that "the use of ad valorem values in making special assessments . . . was the most equitable method that could be employed for the City's project." *City of Boca Raton*, 595 So. 2d at 30.

Matt incorrectly reads *City of Boca Raton.* Even there, in reversing the circuit court's decision not to validate the bonds, this Court still concluded there was competent, substantial evidence to support the City's legislative findings and directly rejected Matt's argument, stating that "[t]he City was <u>not</u> required to specifically itemize a dollar amount of benefit to be received by each parcel." *Id.* at 31 (emphasis added). This Court also noted that the exact methodology in determining a special benefit is "immaterial," as many factors go into the appraisal of property, and, thus, the assessment "may vary within the district, as long as the amount of the assessment for each tract is not in excess of the proportional benefits as compared to other assessments on other tracts." *Id.* (quoting *S. Trail Fire Control Dist. v. State*, 273 So. 2d 380, 384 (Fla. 1973)).

Further, in deferring to legislative findings, this Court has approved more generalized findings concerning special benefits where the benefit bore a logical relationship to the property. For instance, in *Morris*, 163 So. 3d 1174, this Court considered whether a municipality's special assessment for fire services was a "special benefit" to the property owners or a tax, given that fire services were a general benefit to the community at large. After explaining that a "logical relationship" between the services provided and the benefit to the property is the proper test, not whether the services confer a "unique" benefit, this Court concluded that there was a special benefit logically related to the subject properties based on the municipality's finding of legislative intent in its ordinance, which contained no empirical data concerning the increase in value to property based on the fire services assessment. *Id.* at 1178. Rather, the special benefit was more qualitative and generally described as: protecting "the value and integrity" of improvements; protecting the "life and safety of intended occupants"; "lowering the cost of fire insurance"; and "containing and extinguishing the spread of fire incidents occurring on property." *Id.*

Additionally, in *Morris*, the municipality's experts testified that

the assessment specially benefitted all parcels "by raising property value and marketability, limiting liability by containing fire and preventing its spread to other parcels, ensuring immediate response, and heightening the use and enjoyment of all properties." *Id.* This Court reasoned these findings are similar to reasons we accepted in *Water Oak Management*, which recognized that fire protections services "at a minimum, specially benefit real property by providing for lower insurance premiums and enhancing the value of the property." *Id.* (quoting *Water Oak Mgmt.*, 695 So. 2d at 669).

Similarly here, between the UPRD's legislative findings, the findings in the Methodology report, and Mr. Plenzler's unrefuted testimony, the special assessment to service the 2024 bond issue is clearly logically related to properties within the UPRD community though the benefits are more qualitative and generalized. Further, the properties within the UPRD clearly specially benefit from the recreational services provided in the neighborhood, which are for the health, safety, and welfare of the owners and residents. And as the unrefuted appraisal data shows, well-maintained golf course communities tend to have higher property values.

Thus, because the UPRD's legislative findings—that the 2024 bond issue will specially benefit the burdened properties—will be deferred to and sustained where "reasonable persons may differ," *City of Boca Raton*, 595 So. 2d at 30, we find no error and affirm the final judgment on this point.

### Issue 3 – Due Process

Next, we have considered Matt's due process arguments and conclude that he has raised no basis for relief. Generally, notice and the opportunity to be heard are sufficient to meet procedural due process requirements. *Fla. Bankers Ass'n*, 176 So. 3d at 1266.[12] Here, although Matt does not challenge notice under

_____

12. We ordinarily look to a three-factor test to determine "[t]he specific parameters of the notice and the opportunity to be heard required by procedural due process" given that they "are not evaluated by fixed rules of law, but rather by the requirements of the particular proceeding." *Id.* (alteration in original) (quoting *Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc.*, 3 So. 3d 1220, 1236 (Fla. 2009)). In order to determine what process is constitutionally required, the Court "must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961). "Three factors are relevant in determining what process is constitutionally due: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute

chapter 75, he was given sufficient constructive notice of the bond validation complaint and timely intervened by filing an answer. He was also permitted an opportunity to be heard at the bond validation hearing and allowed to present evidence and make argument.

However, as to his opportunity to be heard at the April 29 bond validation hearing, Matt asserts it was not a fair one due to what he perceived as Judge Nicholas's disrespectful comments to him, refusal to acknowledge his arguments, and entry of final judgment before considering his emergency motion. Matt even sought to disqualify Judge Nicholas.

We first address Matt's argument that Judge Nicholas erred in ruling on his unsworn motion to disqualify and denying it as legally

---

procedural safeguards; and (3) the government's interest." *Keys Citizens*, 795 So. 2d at 948-49. However, because Matt's arguments are either unpreserved or unsupported by the record, we need not go through an exhaustive analysis of the three factors. We have also reviewed *Jackson v. Leon County Elections Canvassing Board*, 204 So. 3d 571 (Fla. 1st DCA 2016), and Matt's argument that the failure to review a pretrial motion before entering final judgment violates due process. However, because the record does not support Matt's contention that Judge Nicholas failed to review his motion for stay before entering final judgment, he has failed to demonstrate any due process issue.

insufficient. Contrary to Matt's arguments, Judge Nicholas properly ruled on the motion to disqualify himself. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.330(h) ("The judge against whom an initial motion to disqualify . . . is directed may determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged."). And Judge Nicholas properly denied Matt's motion as legally insufficient because, being unsworn, his motion did not meet the requirements of rule 2.330(c)(3). Fla. R. Gen. Prac. & Jud. Admin. 2.330(c)(3) (requiring written motion "be sworn to or affirmed by the party by signing the motion or by attaching a separate affidavit").

Additionally, Matt's motion was untimely under rule 2.330(g) because it was filed more than twenty days after the April 29 hearing. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.330(g) (providing that motions to disqualify must be filed "within a reasonable time not to exceed 20 days after discovery by the party . . . of the facts constituting the grounds for the motion" (emphasis added)).

Matt's remaining due process arguments are based on speculation about whether Judge Nicholas actually reviewed Matt's emergency motion to stay and whether Judge Nicholas reviewed exhibits Matt submitted at the April 29 hearing. These arguments

are unpreserved and inadequately argued, and Matt has not argued fundamental error. As a result, they do not form a basis for relief.

## III. CONCLUSION

Finding no error, we affirm the final judgment validating the UPRD's 2024 bond issue.

It is so ordered.

COURIEL, C.J., and LABARGA, MUÑIZ, GROSSHANS, and SASSO, JJ., concur.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Manatee County
    Bond Validations
    Edward Nicholas, Judge
    Case No. 412024CA000252CAAXMA

Dean K. Matt, University Park, Florida,

    for Appellant

Fred E. Moore and Mark Barnebey of Blalock Walters, P.A., Bradenton, Florida; and Jesse R. Butler of Butler Legacy & Litigation, PLLC, Lakewood Ranch, Florida,

    for Appellee University Park Recreation District